**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 07-21516-CIV-HUCK/SIMONTON**
<u>**CONSENT CASE**</u>

**CHANNA IMPORTS, INC.,**

     **Plaintiff,**

**v.**

**HYBUR, LTD.,**

     **Defendant.**

_____/

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

     **THIS CAUSE came before the Court upon a Bench Trial on November 17-18, 2008. Based upon a careful review of the record as a whole, and based upon the findings of fact and conclusions of law set forth herein, the undersigned concludes that judgment shall be entered in favor of Defendant Hybur, Ltd. ("Hybur") and against Plaintiff Channa Imports, Inc. ("Channa") and that the case shall be DISMISSED WITH PREJUDICE.**

     I.     <u>**BACKGROUND AND PROCEDURAL HISTORY**</u>

     **According to the Complaint, Channa is a corporation that owns, exports and sells oriental carpets; and, in May 2006, it contracted with Ocean Express, Ltd. ("Ocean Express") for the purpose of transporting a shipment of its oriental carpets from its warehouse in Milano, Italy to an affiliate in Cozumel, Mexico; and, Ocean Express, in turn, contracted with carriers to perform various legs of the journey, including Hybur, which transported the carpets by ship from Port Everglades, Florida to Puerto Morelos, Mexico (DE # 1).**

     **The carpets were placed on 20 separate pallets for the purpose of facilitating their shipment (DE # 36 at 2, ¶¶ 6-7); and, Channa alleges, when the carpets arrived in Mexico,**

4 of the pallets, worth approximately $200,000, were missing (DE # 1; DE # 36 at 3, ¶ 9). Thus, on June 13, 2007, Plaintiff filed a two-count Complaint in this Court against Ocean Express (Count 1) and Hybur (Count 2) in an attempt to recoup its losses.

On December 5, 2007, the District Court dismissed Channa's claim against Ocean Express, finding that the parties were bound by the forum selection clause in the bill of lading mandating that any lawsuit against Ocean Express be filed in England (DE # 19). On December 19, 2007, this case was referred to the undersigned Magistrate Judge based upon the consent of Channa and the sole remaining defendant, Hybur (DE # 21).

On July 25, 2008, the undersigned granted Hybur's motion for partial summary judgment as to damages, finding that the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.A. § 30701 note (2007), limited Channa's recovery to $2,000, based upon the fact that COGSA contains a $500 limitation of liability per "package," which in this case consisted of the 4 missing pallets of oriental carpets.  The undersigned expressly reserved judgment as to whether Hybur was liable for losses less than $2,000, or whether it was liable at all (DE # 38).  Hybur maintained that it was not liable for any losses whatsoever and, thus, this case proceeded to trial, which was held before the undersigned Magistrate Judge on November 17-28, 2008.

## II.   FINDINGS OF FACT

The following findings of fact are undisputed unless otherwise noted and, to the extent that they are more properly characterized as conclusions of law, they shall be considered as such.

1.      Channa is a foreign corporation that owns, exports and sells oriental carpets, including the carpets that were allegedly lost during shipment and at issue in this case (DE # 52 at 1, ¶ 1; DE # 53 at 1, ¶¶ 1-2).  Channa is a "shipper," as that term is

used under COGSA.

2.      Channa contracted with Ocean Express to ship a 40-foot container of oriental carpets from its warehouse in Milano, Italy to an affiliate's warehouse in Cozumel, Mexico (DE # 52 at 2, ¶¶ 3-4; DE # 53 at 2, ¶ 6).  Ocean Express, in turn, subcontracted with various other carriers, including Hybur, to complete various portions of the shipment between Italy and Mexico (DE # 52 at 3, ¶ 6; DE # 53 at 2).

3.      Hybur was one of those carriers contracted by Ocean Express; and, it was responsible for shipping the carpets from Port Everglades, Florida to Puerto Morelos, Mexico.  Hybur a "carrier," as that term is used under COGSA.

4.      When Hybur transported the container of carpets to Puerto Morelos, they were to be picked up by Lapis Itor de Cozumel ("Lapis"), an affiliate of Channa.  Lapis took custody of the container and was responsible for transporting it from Puerto Morelos to its final destination in Cozumel, Mexico.  Lapis is therefore a "consignee," as that term is used under COGSA.

5.      According to the deposition and trial testimony of Channa's owner, Uri Ben Yehuda, it was Channa's general business practice to begin preparing carpets for shipment 2 to 3 days in advance, or sometimes a week in advance.  Agents of Channa, including Mr. Ben Yehuda, would begin by selecting the carpets that were to be shipped, and the bar code for each individual carpet that was selected for shipment was scanned. Workers would fold the carpets and place them on a pallet, until the pallet reached a particular height.  A packing list would then be created to inventory the carpets that were selected for shipment; and the pallets remained in a corner of the warehouse, where they would eventually be loaded into a shipping container when the first carrier arrived (DE # 33, Ex. 1 at 9-10) (November 17, 2008 Real Time Transcript ("Nov. 17 Tr.")).

6.      In this case, Channa generated a packing list reflecting that it prepared 1,834 carpets for shipment on 20 pallets (Trial Exhibit ("Trial Ex.") 20).  At some point between the time that the carpets were placed on the pallets and the time that the pallets were loaded into the shipping container, the pallets were weighed at Channa's warehouse, and the weight of each pallet is reflected on the packing list.

7.      The parties agree that total gross weight[1] of the 20 pallets of carpets prior to shipment was 25,432 pounds (11,536 kilograms) (DE # 52 at 2, ¶ 9; DE # 53 at 2 ¶ 8) (Nov. 17 Tr. at 65-66).[2]

8.      To put the remaining Findings of Fact in context, the Court notes that Channa alleges that Pallet Nos. 6, 8, 13 and 14 were missing when the container was opened upon reaching its final destination (DE # 43, Ex. B at 4); and, based on the packing list, the gross weights of those pallets were as follows: Pallet No. 6 weighed 1,239 pounds (562 kilograms); Pallet No. 8 weighed 1,433 pounds (650 kilograms); Pallet No. 13 weighed 1,005 pounds (456 kilograms); and Pallet No. 14 weighed 1,309 pounds (594 kilograms) (Trial Ex. 20).  Thus, the gross weight of the missing carpets is 4,986 pounds.[3]

9.      On May 8, 2008, Spinelli, SRL ("Spinelli"), a trucking company contracted

---

[1]  The "gross weight" represents the weight of the carpets, plus the pallets onto which the carpets are braced.  The "net weight" is the weight of the carpets, apart from the pallets (*see* Nov. 17 Tr. at 72).

[2]  This is consistent with the Invoice prepared by Channa and sent to its affiliate in Mexico, Lapis Itor de Cozumel ("Lapis"), showing that the total gross weight of the carpets before they were placed in the container was 11,536 kilograms.

[3]  The undersigned notes that Channa, in its proposed findings of fact, states that the weight of the missing carpets is 4,976 pounds (2,262 kilograms), but provides no basis for this calculation, which appears to be an error (DE # 53 at 3, ¶ 23).

by Ocean Express, sent a driver to Channa's warehouse, where the carpets were loaded onto a 40-foot shipping container to be transported to a port in Genova, Italy.  After the carpets were loaded, a white seal, No. H164125, provided by the truck driver (the "Spinelli Seal"), was affixed to the shipping container (DE # 52 at 4, ¶ 13; DE # 53 at 2, ¶ 7) (Trial Exs. 1-2) (Nov. 17 Tr. at 79).[4]

10.     Mr. Ben Yehuda testified at deposition that he could not specifically remember whether he watched the carpets at issue in this case get loaded into the shipping container, nor whether he watched the seal get affixed to the container (DE # 33, Ex. 1 at 19); and, Channa did not offer testimony from any other person that was present at the time the carpets were initially loaded onto the shipping container at Channa's warehouse in Milano, Italy (DE # 52 at 4, ¶ 14).

11.     On May 9, 2006, the container arrived at the port in Genova, Italy (DE # 52 at 4, ¶ 13).[5]  Eight days later, on May 17, 2006, it was loaded aboard the Barcelona Express;[6] and, another fifteen days later, on June 1, 2006, the container arrived at the Port of Miami, Florida, where it remained for 7 days, until June 7, 2006 (DE # 52 at 4-5, ¶¶ 15-17; DE # 53 at 2, ¶¶ 9-12).

12.     On June 7, 2006, Delta Trucking, Inc. ("Delta"), a carrier hired by Ocean

---

[4]  It is undisputed that the shipping container is identified by No. IVLU-852691-2 (DE # 54 at 1).

[5]  Mr. Ben Yehuda testified that the drive to the port in Genova, Italy was an hour by car, and speculated that it would take longer with a container (Nov. 17 Tr. at 71).  It is not clear what time the container was picked up by Spinelli, however.

[6]  On May 17, 2006, Ocean Express issued Bill of Lading No. IOCJ00092, indicating that a 40-foot shipping container said to contain 20 pallets of 1,834 oriental carpets weighing 11,536 kilograms would be shipped aboard the Barcelona Express from Genova, Italy to Miami, Florida (Trial Ex. 2).

Express, transported the container from the Port of Miami to Hybur's shipping facility in Port Everglades, Florida (DE # 52 at 4, ¶¶ 18-19; DE # 53 at 2, ¶¶ 12-14) (Trial Exs. 3-4).[7]

13.    When the truck left the Port of Miami on June 7, 2006 at 1:36 p.m., an Equipment Interchange Receipt was generated on which the truck driver entered "23" in the field marked "WEIGHT" (Trial Ex. 6), but there is no evidence to explain what the number "23" means in this context.[8]

14.    On June 7, 2006 at 2:19 p.m., approximately a half-mile from the Port Everglades facility, and approximately thirty minutes before being delivered to Hybur,[9] the container and its contents were weighed along with the tractor truck and chassis. The combined weight of the container, its contents, the truck and the chassis was 52,740 pounds (DE # 52 at 5-6, ¶ 23; DE # 53 at 3, ¶ 16; DE # 54 at 2, ¶ 3) (Trial Ex. 7) (Nov. 17 Tr. at 36) (Nov. 18 Tr. at 20, 69).

15.    Eduardo Pichardo, the vice president and general manager of Delta, with 28 years of experience in trucking, testified that Delta's drivers use their own trucks, not trucks that are owned or provided to them by Delta.  He stated that he did not know any

---

[7]  On June 7, 2006, Delta issued Bill of Lading No. 60699 (Trial Ex. 4).

[8]  Channa asserted, in its proposed findings of fact, that "23" signifies the estimated weight of the cargo, which was 25,432 pounds (DE # 53 at 5-6, ¶ 15), but this is not supported by common sense or the evidence introduced at trial.  When Eduardo Pichardo, the vice president and general manager of Delta Trucking, testified at trial, he stated that he did not know what the number "23" meant (Nov. 17 Tr. at 34), and no further evidence regarding this entry was introduced by either party.

[9]  Jack Williams, an employee of Hyde Shipping, testified at the trial that Hybur is an ocean carrier that operates the vessels between domestic and foreign ports.  Hyde Shipping is the shipping agent for Hybur that operates the Port Everglades facility, takes bookings, prepares the paperwork and provides stevedoring services to the vessels in preparation for shipping.  Both entities will be referred to as "Hybur" herein (Nov. 18 Tr. at 15-17).

details about the particular truck used to ship the container of oriental carpets at issue in this case, but that an average truck that typically performs similar transports weighs approximately 11,000 to 13,000 pounds, which can be subject to further variations, including whether the truck is filled with fuel. According to Mr. Pichardo, the combined weight of a chassis and empty 40-foot container is approximately 15,000 pounds (Nov. 17 Tr. at 41-43). Thus, according to Mr. Pichardo, the weight of the truck, chassis and empty 40-foot container that were used to ship the oriental carpets was between 26,000 and 28,000 pounds.

16.     On cross-examination, Mr. Pichardo acknowledged on that he did not know the weight of the particular truck that was used to transport the carpets at issue here (Trial Ex. 26) (Nov. 17 Tr. at 46-47).

17.     According to the testimony of Hybur employee, James Williams, the standard weight for a truck is 16,000 pounds; that it might weigh as much as 18,000 pounds; and, a weight of 14,000 pounds for a truck is "on the very, very low side" (Nov. 18 Tr. at 93). In addition, according to Mr. Williams, an empty 40-foot container weighs approximately 8,000 to 9,000 pounds (Nov. 18 Tr. at 43). He also testified that the chassis typically weighs approximately 8,000 pounds (Nov. 18 Tr. at 70, 75). Thus, according to Mr. Williams, the weight of the truck, chassis and empty 40-foot container that were used to ship the oriental carpets was most likely between 32,000 and 35,000 pounds.

18.     Moreover, in preparation for trial, Mr. Williams weighed a standard truck, chassis and empty 40-foot container that are used to deliver cargo similar to the oriental carpets at issue here, and they had a combined weight of 31,740 pounds (Nov. 18 Tr. at 156) (Trial Ex. 26).

7

19.     Based on the fact that the truck, chassis and container weighed 52,740 pounds immediately before the sealed container was transferred to Hybur, Mr. Pichardo's estimates regarding of the weight of the truck, chassis and empty container suggest that the weight of the cargo was approximately 25,000 pounds, indicating that Hybur received a full delivery of all 20 pallets of carpets.

20.     On the other hand, according to Mr. Williams' estimate of the weight of the truck, chassis and empty container, the weight of the cargo immediately before the sealed container was transferred to Hybur was approximately 20,000 pounds, indicating that the four missing pallets were not in the container and, therefore, that Hybur did not receive a full delivery of all 20 pallets of carpets.

21.     After the weigh ticket was issued, the container arrived at Port Everglades, where it was received by Hybur (Trial Exs. 4, 8) (Nov. 17 Tr. at 37).   In accordance with its ordinary business practice, upon receiving the container, Hybur placed a second security seal on it, No. 688015, (the "Hybur Seal").

22.     A Trailer Interchange Receipt ("TIR") was prepared to indicate that the container was received by Hybur and was ready to be loaded onto the ship.  The Hybur TIR indicates that the gross weight of the cargo is 18,000 pounds (8,164.67 kilograms) (DE # 53 at 3, ¶ 20) (Trial Ex. 8) (Nov. 18 Tr. at 40-41).

23.     The gross weight of the cargo reflected in the Hybur TIR is determined at Hybur's terminal, where, according to Mr. Williams' testimony, a Hybur employee estimates the weight of the cargo for stevedoring purposes by beginning with the weight of the truck, chassis, container and cargo as recorded on the weigh ticket (52,740 pounds), and then subtracting the approximate weight of the truck (16,000 pounds),

8

chassis (9,000 pounds),[10] empty container (9,000 pounds) and fuel.  After doing these rough calculations, the terminal employee determined the gross weight of the cargo at issue in this case to be 18,000 pounds at the time it was received by Hybur (Nov. 18 Tr. at 66-71).[11]

24.     The information on the Hybur TIR regarding the size, weight and presence of hazardous cargo in the containers is used to populate a Master Container List, which is used by the stevedoring department in planning how to load the ship to ensure its stability and to conform to weight restrictions and regulations pertaining to the shipment of hazardous materials (Nov. 18 Tr. at 40-42, 71-72).

25.     The container remained in Hybur's container terminal for five days (DE # 52 at 6, ¶¶ 26-27; DE # 53 at 3, ¶ 17) (Nov. 18 Tr. at 30).  Mr. Williams testified that the security at Port Everglades has been improved since September 11, 2001, and that it is now required to have security guards, barbed wire and lighting.  Specifically, he testified, there is only a single entrance to the facility, which is manned by security guards 24 hours a day.  In addition, the containers are stored "nose to door," which means they are placed in close proximity to each other in a manner that prevents them all from being opened, except the last container on the bottom row.  The location of any particular container is unknown and determined by happenstance, based on when it was

---

[10]  James Williams acknowledged that, in an earlier affidavit, he estimated the gross weight of the cargo to be approximately 21,000 pounds, based on his guess that the chassis weighed 6,400 pounds, and not 9,000 pounds, as he testified at trial.  Mr. Williams stated that the weight of a chassis can vary based on the type of material, the manufacturer and whether it is an extended fifth wheel chassis (Nov. 18 Tr. at 75).

[11]  The undersigned notes that Hybur shipped this container on a lump-sum basis and, therefore, the weight of the container did not affect the price it charged to ship it, although for the reasons discussed herein, it was important for the weight to be accurate for the purpose of loading it on to the vessel (Nov. 18 Tr. at 143).

received and processed at the terminal; moreover, the contents of any particular container are not apparent from the outside of the container.  Because they are stacked three-high, the floor of the second row of containers is approximately six feet off the ground, and the floor of the third row of containers is approximately 12 feet off the ground (Nov. 18 Tr. at 149-154).

      26.    On June 12, 2006, the container was loaded onto the vessel Argosy.  The stevedores relied on the estimated weight of the cargo set forth in the Hybur TIR when they generated the Master Container List, which is used to load the ship, and is updated continually throughout the loading process (Trial Ex. 12) (Nov. 18 Tr. at 31, 33).

      27.    On June 12, 2006, the vessel left Port Everglades on its way to Puerto Morelos, Mexico (DE # 52 at 6, ¶¶ 26-27) (Nov. 18 Tr. at 31).[12]

      28.    On June 13, 2006 at 9:52 a.m., Hybur issued an updated version of the Master Container List that reflected the containers that were loaded onto the ship (Trial Ex. 12) (Nov. 18 Tr. at 33-35).

      29.    On June 13, 2006, Hybur issued Bill of Lading No. PEVMEX8640.  The Bill of Lading reflects the date that the container was loaded onto the ship; indicates that both the Spinelli Seal and the Hybur Seal were intact; and states that the gross weight of the cargo is 25,432 pounds (11,535 kilograms); though, it has a heading that reads, "PARTICULARS FURNISHED BY SHIPPER OF GOODS (but not acknowledged by the carrier)" (DE # 54 at 2) (Trial Ex. 9) (Nov. 18 Tr. at 24-25, 31-32).[13]

---

    [12] When the container was loaded onboard the vessel Argosy, it was issued Booking No. 80572 (DE # 53 at 2, ¶ 13).

    [13] Mr. Williams explained that the Master Container List confirms which containers were actually loaded on to the ship and Bills of Lading are only generated for those containers that were actually loaded.  The date on the date on the Bill of Lading,

30.     The voyage from Port Everglades, Florida to Puerto Morelos, Mexico is typically two days (Nov. 18 Tr. at 30).

31.     On June 15, 2006 at the latest,[14] the container arrived in Puerto Morelos Mexico, where it was off-loaded from the ship and placed within the Port Administration facilities known as the "Policia Procuraduria General De La Republica de Mexico" ("PGR"), which is an area controlled by the Mexican government (Trial Ex. 9) (Nov. 18 Tr. at 30, 140).

32.     The Hybur bill of lading reads, "Delivery at final destination is deemed final and complete when Containers are received with original seals intact at . . . PGR . . . within the Port Administration facilities in Puerto Morelos" (DE # 52 at 6-7, ¶ 28) (Trial Ex. 9); *see also* (Nov. 18 Tr. at 141) (explaining that a port-to-port bill of lading commences the carrier's responsibility at the port of loading and ends at the port of discharge).

33.     On June 17, 2006, a final TIR was issued from Puerto Morelos, which indicates that the container left the terminal at Puerto Morelos on that day, after having spent approximately two days at PGR (Trial Ex. 13) (Nov. 18 Tr. at 158-59).[15]  The TIR also

---

June 12, 2006, is the date that the container was loaded and shipped, even though it was not generated until the next day, after the final version of the Master Container List (Nov. 18 Tr. at 33-40).

[14]  Channa contended, in its proposed findings of fact, that the container arrived in Puerto Morelos, Mexico on June 17, 2006 (DE # 53 at 3, ¶ 22), while Hybur contended, in its proposed findings of fact, that the container arrived on June 14, 2006 (DE # 52 at 6, ¶ 28).  Based upon the Bill of Lading, which reflects that the container was received by the terminal operator on June 15, 2006, however, it is not likely that the container arrived after that date, although it could have arrived as early as June 14, 2006 (Trial Ex. 9).

[15]  Mr. Ben Yehuda testified that he instructed his manager in Mexico to report the loss to Ocean Express on June 20, 2006, which was one or two days after the loss occurred.  The undersigned credits this testimony, because it fits the timeline established by the other evidence in this case establishing that the carpets first arrived in Puerto Morelos on June 14 or 15, 2006, remained at the PGR until they were retrieved

indicates that the Hybur Seal remained intact (DE # 52 at 7, ¶ 29; DE # 53 at 3, ¶ 22) (Nov. 18 Tr. at 30-31, 138-40).

34.     Although this TIR is silent as to the integrity of the Spinelli Seal, Channa does not dispute that both seals were intact when the container was received at its final destination in Cozumel, Mexico.

35.     The carpets were then driven from Puerto Morelos to their final destination in Cozumel, Mexico (DE # 52 at 6, ¶ 29) (DE # 53 at 3, ¶ 23).

36.     When the container reached its final destination, both the Spinelli Seal and the Hybur Seal were still intact (DE # 52 at 7, ¶ 35).  However, when it was opened at the store in Cozumel Mexico, the manager reported that four pallets of carpets were missing; and, he took photographs of the goods that were delivered (Trial Ex. 21) (Nov. 17 Tr. at 123, 128).

37.     On June 20, 2006, according to Mr. Ben Yehuda's testimony, he became aware that the carpets were missing and instructed his manager and corporate legal representative in Mexico to notify the police and Ocean Express of the loss (Nov. 17 Tr. at 110-11).

38.     Channa reported the loss to Ocean Express on June 20, 2006 (Nov. 17 Tr. at 111).  However, the loss was not reported to Hybur until it was served with a summons in this case (Nov. 18 Tr. at 145).[16]

_____

at some point between June 15 and 17, 2006 and ultimately arrived at their final destination in Cozumel at some point between June 17 and 19, 2006.  In fact, Mr. Ben Yehuda himself states that the loss occurred on June 16, 2006, after the carpets arrived in Puerto Morelos and were unloaded from the ship (Nov. 17 Tr. at 111-12).

    [16]  Hybur never expressly argued that Channa's COGSA claims were barred based on its failure to notify Hybur of the loss within the time provided in the statute.  *See* 46 U.S.C. § 30701 note, sec. 3(6) ("If the loss . . . is not apparent, the notice must be given

III.   **LEGAL FRAMEWORK FOR ANALYSIS**

A.   **The Prima Facie Case**

In *Plastique Tags, Inc. v. Asia Trans Line, Inc.*, 83 F.3d 1367 (11th Cir. 1996), the

Eleventh Circuit Court of Appeals set forth the requirements to establish a *prima facie*

case under The Carriage of Goods by Sea Act:

> To hold a carrier liable for missing or damaged goods under COGSA, a
> shipper must prove that the goods were damaged or lost while in the
> carrier's custody.  *See Sony Magnetic Products Inc. v. Merivienti O/Y*, 863
> F.2d 1537, 1539 (11th Cir. 1989).  The shipper can meet this burden by
> showing: 1) full delivery of the goods in good condition to the carrier, and
> 2) outturn by the carrier of the cargo with damaged or missing goods.  *Id.*

*Plastique Tags*, 83 F.3d at 1369.  In order to establish a *prima facie* case, "the plaintiff is

not required to prove that the defendant was at fault or explain how the damage might

have occurred."  *Leather's Best Int'l, Inc. v. MV "Lloyd Sergipe"*, 760 F. Supp. 301, 308

(S.D.N.Y. 1991).

1.   **Full Delivery of Goods**

"In order for a bill of lading to constitute prima facie proof that the carrier

received cargo consistent with the terms of the bill, it must either be without limiting

language such as 'shipper's load and count' or it must contain terms that the carrier can

verify."  *Plastique Tags*, 83 F.3d at 1370.  Thus, in a case involving a sealed container,

"[i]t has long been established that the weight listed on a bill of lading is prima facie

---

[to the carrier his agent] within three days of the delivery.").  The undersigned simply
notes that Mr. Ben Yehuda testified that Channa notified Ocean Express of the loss
within 1 to 3 days of discovering it (Nov. 17 at 111-112).  Because Channa contracted
with Ocean Express to arrange for the entire shipment and had no direct business
dealings with Hybur, this was sufficient notice.  *See Sogem-Afriment, Inc. v. MV Ikan
Selayang*, 951 F. Supp. 429, 438 n.8 (S.D.N.Y. 1996) ("Considering the undeniable fact
that plaintiff and defendant had established a course of business which required
information to be conveyed through the broker, it is entirely reasonable that plaintiff
would notify defendant in this same manner.").

proof of receipt by the carrier of that weight regardless of attempted reservations like 'said to weigh,' 'shipper's load and count,' and 'contents of packages are shipper's declaration'" *Westway Coffee Corp. v. MV Netuno*, 675 F.2d 30, 32 (2d Cir. 1982), because those terms "are verifiable by the carrier." *Plastique Tags*, 83 F.3d at 1370.

This is so even if the facts of a given case demonstrate that it would be impractical to weigh a particular container at issue, because COGSA specifically provides that "no carrier . . . shall be bound to state or show in the bill of lading any . . . weight . . . which he has had no reasonable means of checking." *Leather's Best*, 760 F. Supp. at 309 (quoting  46 App. U.S.C.A. § 1303(3) (1982)).[17]

In other words, a carrier will be presumed to have the ability to confirm the weight of a sealed container and will therefore be bound by the weight set forth in the bill of lading notwithstanding any limiting language added to the bill of lading; if the carrier does not wish to be bound to the weight set forth in the bill of lading, it must identify the cargo by other means.

      2.    <u>Short Outturn by the Carrier</u>

With regard to the second prong of the plaintiff's *prima facie* case under COGSA, the time of outturn has been defined as "the time of delivery to the port of destination, the time of discharge, or the time goods [are] delivered to the consignee's agent." *Resources Recovery, Inc. v. China Ocean Shipping (Group) Co.*, N. 96-CV-4409-JSM, 1998 WL 474134, at *2 (S.D.N.Y. July 11, 1998) (citing *Bally, Inc. v. MV Zim America*, 22 F.3d 65, 70 (2d Cir. 1994)).  In accordance with the statutory text, which "covers the

---

[17]    Although the Carriage of Goods by Sea Act previously appeared in 46 App. U.S.C.A. §§ 1300, *et seq.* (2006), the current version, which is identical in all material respects, is found at 46 U.S.C.A. § 30701 note (2007).

14

period from the time when the goods are loaded on to the time when they are discharged from the ship," 46 U.S.C. § 30701 note, sec. 1(e), "the obligation to carry and care for the goods" generally "remains on the carrier until the goods are actually delivered by being discharged at the port of discharge."  *Hale Container Line, Inc. v. Houston Sea Packing Co.*, 137 F.3d 1455, 1470-71 (11th Cir. 1998); *accord Allstate Ins. Co. v. Imparca Lines*, 646 F.2d 166, 168-69 (5th Cir. 1981).  "Presentation of probative evidence by the plaintiff proving damages upon discharge by the carrier is essential to making a prima facie case."  *S.T.S. Int'l, Ltd. v. Laurel Sea Transport, Ltd.*, 932 F.2d 437, 440 (5th Cir. 1991). "Delivery by a carrier of a container with an intact seal," however, "does not conclusively prove that the loss did not occur while the container was in the carrier's possession."  *Bally*, 22 F.3d at 70.

IV.    **ANALYSIS**

For the reasons that follow, the undersigned concludes that Channa failed to make its *prima face* case under COGSA.  While it satisfied its burden of establishing that it made a full delivery of the carpets in question to Hybur by virtue of the terms of the Bill of Lading, it failed to demonstrate that there was a shortage of carpets at outturn.

A.    **Full Delivery of Goods**

1.    **Evidence of the Weight of the Carpets**

Although the Bill of Lading is dispositive in establishing the first prong of Channa's *prima facie* case, it is instructive to begin the analysis by momentarily disregarding the Bill of Lading and summarizing the evidentiary record concerning the shipment of carpets that is presently before the Court:

Channa individually weighed the carpets selected for shipment at its warehouse in Italy.  The 20 pallets that were set aside to be shipped to Mexico weighed a total of

25,432 pounds; and, the four pallets which were purportedly lost weighed 4,986 pounds. The palletized carpets remained in Channa's warehouse for a number of days until they were scheduled to be picked up by a trucking company to begin the voyage to Mexico. There is no direct, independent evidence to indicate whether all 20 pallets of carpets were actually loaded into the shipping container; and, the parties dispute whether all 20 pallets that were intended to be shipped were actually loaded into the container at this point.  The container was sealed before it left Channa's warehouse, and the security seal was intact when the container arrived at its final destination in Cozumel, Mexico. Significantly, the sealed container was never reliably weighed at any point in the voyage. Although the truck, chassis and container were all weighed together immediately before Hybur took control of the container, the variations between the possible weights of the truck and chassis more than account for the weight of the allegedly missing carpets. Thus, the evidence in the record does not directly indicate whether Hybur in fact received all 20 pallets of carpets.

Indeed, the undersigned finds that it is more likely than not that Hybur never received a full delivery of 25,432 pounds of carpets on 20 pallets.  In this regard, the undersigned credits the testimony of James Williams, based on his demeanor and the fact that he was a knowledgeable and forthcoming witness.

First, Mr. Williams testified, based on his years of experience in the shipping industry, that the approximate weight for a truck (16,000-18,000 pounds), chassis (8,000 pounds) and container (8,000-9,000 pounds) is 32,000-35,000 pounds.  Based on these calculations and the fact that the truck, chassis, container and cargo together weighed 52,740 immediately before the container was turned over Hybur, the cargo likely weighed between 17,740 and 20,740 pounds, which suggests that Hybur did not receive the full

16

shipment of carpets because this weight is consistent with the weight of the full shipment of carpets (25,432 pounds) minus the missing pallets of carpets (4,986 pounds).

Mr. Williams also weighed a standard truck, chassis and container in preparation for his testimony and introduced evidence to show that they weighed a combined 31,740 pounds, which bolsters his rough estimates set forth in the preceding paragraph and indicates that Hybur never received full delivery of the cargo consisting of 20 pallets of carpets.

Finally, Mr. Williams explained that because the container was shipped on a lump-sum basis, and not the weight of the container, Hybur simply accepted Channa's statement that the container weighed 25,532 pounds.[18]  In contrast, Mr. Williams explained, it was vital that the weight of the container be accurately expressed on the Hybur TIR because that document was used to populate the Master Container List, which was used by the stevedores to arrange the containers on the ship in a manner that would prevent any tipping or imbalance.  The Hybur TIR was prepared by a Hybur employee from its stevedoring department at the time that Hybur accepted custody of

_____

[18]  Based on Mr. Williams' testimony, the undersigned agrees that the weight of the cargo on its Bill of Lading is identical to the weight of the cargo provided by Channa, and that each successive carrier simply transcribed that number onto its respective bill of lading, without independently weighing the container.  Channa's attempt to refute the contention that the weight of the cargo was not simply passed down in this manner is not persuasive.  Its attorney argued that the Ocean Express Bill of Lading indicated the weight of the cargo to be 11,536 kilograms (Trial Ex. 2), while the Hybur Bills of Lading indicated the weight to be 11,535.77 kilograms (Trial Exs. 9-11).  What this shows is that Hybur was indeed copying the weight of the cargo "from bill of lading to bill of lading," based on Channa's original measurement, as Mr. Williams testified, but that it did so using pounds, not kilograms.  Thus, the discrepancy between the bills of lading is simply due to the conversion between the weight of the cargo in pounds and the weight of the cargo in kilograms (Nov. 18 Tr. at 176-78).

the container.  First, the truck driver supplied the Hybur employee with the weigh ticket generated at the weigh station immediately prior to its arrival at Port Everglades, Florida, which reflected the combined weight of the truck, chassis, container and cargo.  Then, based on his direct observation of the truck, chassis and container, the Hybur employee would estimate the weight of the cargo.[19]  In this case, the estimated weight of the cargo was 18,000 pounds, which further suggests that Hybur did not receive the full delivery of 25,000 pounds of carpets.[20]

To the extent that Mr. Williams' testimony conflicts with the testimony offered by Eduardo Pichardo, the vice president and general manager of Delta Trucking, the undersigned finds that Mr. Pichardo was not a credible witness, based on his demeanor and his inability to explain fundamental facts that were crucial to this lawsuit.  Specifically, the gaps in Mr. Pichardo's knowledge make it impossible to ascertain the precise weight of the carpets that Hybur received, even though the sealed container was weighed on two separate occasions before Hybur accepted custody of it.  The first such gap pertains to the weighing of the container at the Port of Miami.  Although Delta's trucker weighed the container at this time, he recorded the weight as "23," and Mr.

---

[19]  In fact, the Hybur TIR is the only evidence in the record that reflects the weight of the truck and chassis based on the observation of the truck and chassis that were *actually* used to transport the container at issue in this case.  By contrast, Mr. Williams and Mr. Pichardo testified about the weight of a truck and chassis that could *hypothetically* be used to transport the container, and resulted in estimates that ranged between 26,000 and 35,000 pounds.

[20]  Mr. Williams testified that the purpose of estimating the weight of the cargo for the purpose of creating the Hybur TIR is to ensure that the ship is safely loaded, not to confirm the weight of the cargo that is stated on the Bill of Lading; and, that it was not customary to inform the shipper if the weight of the cargo on the Hybur TIR was different than the weight on the Bill of Lading – especially when the cost of the shipment was on a lump-sum basis, rather than the weight of the cargo – because the two documents served different purposes (Nov. 18 Tr. at 92-95).

Pichardo was not able to explain the meaning of the number "23" in this context. Second, when the container was weighed immediately before arriving at Port Everglades, it was placed on the scale together with the truck and the chassis.  Mr. Pichardo, however, was not able to identify the model of the truck or the chassis that was used by its driver to transport the container on that day.[21]  The undersigned notes that Mr. Pichardo nevertheless estimated the weight of the truck and chassis and, those weights suggest that Hybur received a full delivery of all 25,432 pounds of carpets; but, his estimates were first derived before he knew whether his corporation, Delta Trucking, would be sued in connection with the shipment at issue here.  Therefore, his estimates of the weight of the truck and chassis tend to inculpate Hybur at the same time that they exculpate Delta Trucking.

Accordingly, based on the record as a whole apart from the Bill of Lading, the undersigned finds that Hybur most likely did not receive a full delivery of the carpets. Nevertheless, for the reasons that follow, the undersigned finds that Hybur is deemed to have received all 25,432 pounds of carpets because it issued a Bill of Lading for that amount of carpets.

    2.    <u>The Bill of Lading</u>

In establishing the first prong of its *prima facie* case, Channa relies on its business records, which show that all 20 pallets weighed 25,432 pounds, as well as the Bill of Lading, which reflects that Hybur received 25,432 pounds of carpets in a sealed

---

[21]  The undersigned notes that Mr. Pichardo testified that Delta's drivers own the trucks and that Delta does not provide them; and, that the driver that delivered the container at issue in this case no longer works for Delta.  However, there is no indication why this basic information was not kept in Delta's business records or why it would not be able to obtain this information for the purpose of testifying accurately in this lawsuit.

container.  The undersigned agrees with Channa that, when Hybur issued the Bill of Lading, it "represent[ed] that [it] ha[d] no reasonable ground for suspecting that the weight of the goods actually received varie[d] from the listed weight and that [it] had a reasonable means of checking the weight."  *Westway Coffee Corp. v. MV Netuno*, 675 F.2d 30, 33 (2d Cir. 1982).  Therefore, Hybur is deemed to have received 25,432 pounds of carpets; and, based on the business records documenting the precise weight of each pallet, this represents all 20 pallets of carpets.[22]

The undersigned is cognizant of the fact that the Hybur representative, James Williams, testified that, notwithstanding the legal presumption described above, Hybur in fact had no reasonable means of checking the weight of the container for the purpose of issuing a new bill of lading in this case; however, the statutorily-imposed representation in the Bill of Lading that Hybur "has no reasonable ground for suspecting that the weight of goods actually received varied from the listed weight and that [it] ha[d] a *reasonable means of checking* the weight," 46 U.S.C. § 30701 note, sec. 3(3), is sufficient to establish the first prong of Channa's *prima facie* case that Hybur received the weight of cargo listed in the Bill of Lading, whether or not the container was *actually* weighed. *Leather's Best Int'l, Inc. v. MV "Lloyd Sergipe"*, 760 F. Supp. 301, 308-09 (S.D.N.Y. 1991).

Mr. Williams implied that it would impose an untenable cost upon carriers like

---

[22]   *See Great Am. Ins. Co. v. MV Mackinac Bridge*, No. 05-CV-6537 (BSJ)(AJP), 2008 WL 4615793, at *4 n.7 (S.D.N.Y. Mar. 25, 2008) ("[T]he load weight of the Container may be used to make a plaintiff's *prima facie* case when that weight is linked to the weight of the cargo.").  *Cf. A.I.G. Uruguay Compania de Seguros v. AAA Cooper Transp.*, 334 F.3d 997, 1007-08 (11th Cir. 2003) ("When business records are routinely and systematically made contemporaneously with the packing and packaging of a particular shipment, and these documents clearly identify the specific contents of those shipments, then we perceive no problem in accepting that proof as the type able to meet the shipper's burden.").

Hybur if they were required to precisely confirm the contents of every sealed container that it accepts, but this ruling is not as draconian as Mr. Williams' testimony might otherwise suggest.  It is clear that Courts are instructed to disregard purported limited language and bind carriers like Hybur to the contents of their Bills of Lading only when they identify the *weight* of sealed containers, because the weight of a container is presumed to be verifiable, even if the carrier claims that it is too impractical or expensive to do so in the context of any particular lawsuit.

If Hybur's Bill of Lading in this case had simply identified the cargo based on the number of carpets, and not the weight of the carpets, then Hybur would have been permitted to rely on the limiting language contained in the Bill of Lading; and, in turn, would have been permitted to hold Channa to a heightened burden of proving by direct evidence the actual number of carpets in the container.  The reason for the disparate treatment is logical: Whereas the weight of a sealed container is presumptively "readily verifiable," the precise description and number of goods in a sealed container is not.[23]

-----

[23]  The undersigned notes that this case differs from *Leather's Best Int'l, Inc. v. MV "Lloyd Sergipe"*, 760 F. Supp. 301, 309 n.17 (S.D.N.Y. 1991), and *Westway Coffee Corp. v. MV Netuno*, 675 F.2d 30, 33 n.3 (2d Cir. 1982), because there is some evidence that Hybur received less than the stated amount of carpets – including the Hybur TIR, which had to be accurate for stevedoring purposes, and which estimated the weight of the cargo to be 18,000 pounds, not 25,432 pounds as stated on the Bill of Lading. However, because it is immaterial to the ultimate resolution of this case, it is not necessary to decide whether Hybur is estopped from relying on such evidence to rebut the weight of the cargo as reflected on the Bill of Lading.  The undersigned simply notes that this is a matter of dispute between the parties: Hybur argues, among other things, that Channa did not rely on the Bill of Lading because Channa was unaware that Ocean Express had contracted with Hybur to complete a portion of the transport (DE # 61); and Channa argues, among other things, that it did rely on the Bill of Lading because if it had been informed of the discrepancy, it could have demanded an investigation to determine the true weight of the container at that time (DE # 60).  *See generally Portland Fish Co. v. States Steamship Co.*, 510 F.2d 628, 633 & n.15 (9th Cir. 1974).

B.     **Short Outturn by the Carrier**

The undersigned concludes that Channa failed to establish that there was a shortage of carpets at outturn and, therefore, it has not established a *prima facie* case under COGSA.

In *Bally, Inc. v. MV Zim America*, 22 F.3d 65 (2d Cir. 1994), the Second Circuit Court of Appeals addressed a scenario similar to the one at issue in this case.  In *Bally*, as here, the plaintiff-shipper sued the defendant-carrier under COGSA; the district court found that the plaintiff satisfied the first prong of its *prima face* case; and, the parties stipulated that some of the cargo was missing from a sealed container when it was inventoried at its final point of destination.  *Id.*  Though the district court concluded that there was a shortage at outturn based on the parties' stipulation that some of the cargo was missing when it was inventoried at the warehouse, the court of appeals reversed on the grounds that "the district court incorrectly identified the point of outturn."  *Id.* at 69.

> "Outturn" occurred when [the defendant-carrier] delivered the containers to [the plaintiff-shipper's] agent . . . .  *See, e.g., Nissho-Iwai Co. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir. 1983) (outturn occurs "at the time of discharge"); *J. Gerber & Co. v. S.S. Sabine Howaldt*, 437 F.2d 580, 584 (2d Cir. 1971) (outturn occurs upon delivery at port of destination).  It was at that location that [the plaintiff-shipper] was required to establish the loss.
>
> By proving, through a stipulation, only that the cartons were missing when the container was inventoried at its warehouse . . ., [the plaintiff-shipper] did not rule out the possibility that the goods were pilfered . . . while [in its agent's] custody, while stored at Port Security, or during or after unloading of the container at [its] warehouse."

*Id.*

The Second Circuit noted that, although "[d]elivery by a carrier of a container with an intact seal does not conclusively prove that loss did not occur while the container was in the carrier's possession," the "significance of a security seal . . . of course will

depend on the unique facts of the case." *Id.* at 70.  Thus, in *Bally*, the Second Circuit ruled that the district court could not conclude that the cargo was missing from the sealed container at the time of outturn based solely on the shortage of cargo at the final point of destination given that "the container was sealed the entire time it was in [defendant's] custody," and there was no "evidence that the container had been tampered with" or that the "high-security seal had been breached," even though plaintiff had introduced evidence of its own security measures to show that the loss could not have occurred between the time of discharge and the time that the cargo was inventoried at the warehouse.  *Id.*

In sum, Channa does not dispute that the Spinelli Seal remained intact throughout the voyage and the Hybur Seal remained intact during the entire time that Hybur was in possession of the container; nor has Channa introduced any evidence that the container was tampered with.  Although this does not conclusively prove that the loss did not occur during the time that Hybur was in possession of the container, it supports such a conclusion.  *See Sport World (U.K.) Ltd., v. MV OOCL Breeze*, No. 94 Civ 2890 (DC), 1996 WL 185675, at *4 (S.D.N.Y. Apr. 18, 1996) (granting defendant's motion for summary judgment where the seal on the container "remained intact throughout the period the container was in [defendant's] custody[, where t]here is no evidence that the numbered . . . seal was replaced with a duplicate, nor is there any evidence of tampering with the seal or the container itself."); *GFT U.S.A. Corp. v. MV Export Freedom*, No. 93 CIV 4557 (RPP), 1995 WL 276193, at *13 (S.D.N.Y. May 11, 1995) ("Where cargo is missing from a sealed container, and the ocean carrier has demonstrated that at the time it delivered the container to the consignee the seals were intact, the ocean carrier is ordinarily not liable for any loss of cargo.").

And, it is especially true here, where Channa failed to present any evidence at all to suggest that the missing cargo was more likely to have been removed from the container while it was in Hybur's custody than at any other time after the container was transferred to the consignee's custody, whether the loss occurred while the container was at the PGR in Puerto Morelos, en route to the warehouse where the shortage was discovered, or after it was delivered to the warehouse.[24]  *See Bally*, 22 F.3d at 70; *see also American Home Assur. Co. v. DAMPSKLBSSELSKABET AF 1912*, No. 00-2240-CIV, 2003 WL 1873738, at *10 (S.D. Fla. Jan. 8, 2003) (Brown, M.J.) ("Plaintiff cannot establish a *prima facie* case if the evidence indicates that the loss was as likely to have happened

---

[24]   Because there is no dispute (1) that Hybur's responsibility was limited to shipping the container from Port Everglades, Florida to Puerto Morelos, Mexico; (2) that Lapis, a Channa affiliate and consignee, took possession of the container in the PGR at Puerto Morelos; (3) that Lapis arranged for the container to be driven by truck from Puerto Morelos to its final destination in Cozumel, Mexico; and (4) because neither party introduced any evidence at all to suggest that the loss was more likely to have occurred at any single point between the time that the container was offloaded at Puerto Morelos and the time that the loss was discovered at the warehouse in Cozumel, there is no need to pinpoint the exact moment that "outturn" occurred.  *Compare Farrell Lines Inc. v. Highlands Ins. Co.*, 532 F. Supp. 77, 80 (S.D.N.Y. 1982) ("[D]elivery occurred, at the latest, when the cargo was placed on the dock in the custody of [the national port authority] – the point described in the bill of lading – which coincides with the custom and usage of delivery at that port – the point described by the case law.") *with Certain Underwriters at Lloyds' v. Barber Blue Sea Line*, 675 F.2d 266, 268-69 (11th Cir. 1982) (where contract of carriage expressly extended carrier's liability until the goods "are delivered to port authorities or the Consignee," the carrier was liable until the goods were delivered to the Consignee, based on the undisputed evidence that delivery to the port authorities was impossible because the port of destination was a non-operating entity).

Because the Bill of Lading defined delivery as the time when the container was offloaded "with original seals intact at . . . PGR . . . within the Port Administration facilities in Puerto Morelos," the undersigned finds that outturn therefore occurred no later than June 15, 2006.  However, even if "outturn" is defined in the manner most favorable to Channa as occurring after the container was cleared by Mexican authorities and after it left Puerto Morelos by truck in Lapis' custody, the analysis remains the same. Simply stated, there is no proof that there was a shortage of goods at outturn and there is an unaccounted for gap in time in which the loss could have occurred after Hybur relinquished control of the container to the consignee, Lapis.

before or after [the carrier] had responsibility for the cargo, as when the cargo was actually in the custody of [the carrier]."); *AIG Europe, S.A. v. Locust Point Terminal Corp.*, 134 F.3d 362, 1998 WL 1347, at *3 (4th Cir. Jan. 5, 1998) (unpub. op.) (affirming judgment in favor of defendant-carrier where, although plaintiff established first prong of its *prima facie* case, it failed to satisfy second prong, because "theft would be virtually impossible at sea[; and t]hough it could easily be inferred that the containers had been tampered with [after being discharged] while in the foreign port, . . . employees inspected the containers and found the seals to be intact"); *Junior Gallery, Ltd. v. Neptune Orient Lines, Ltd.*, No. 94 Civ. 4518(DC), 1998 WL 770558, at *6 (S.D.N.Y. Nov. 3, 1998) (concluding that, although plaintiff established the first prong of its *prima facie* case, it failed to satisfy second prong because a finding that the loss occurred while the container was in carrier's custody "would be speculative and not supported by the record" where the carrier's terminal was equipped with security features and the containers were stacked in a manner to prevent unauthorized access, even though plaintiff presented evidence that containers in the carrier's terminal had been broken into in the past and that, when the container was removed, its gate pass was stamped with the words "WEIGHT DISCREPANCY"); *R.B.K. Argentina S.A. v. MV Dr. Juan B. Alberdi*, 935 F. Supp. 358, 368-71 (S.D.N.Y. 1996) (holding that, "in order for plaintiff to successfully establish a *prima facie* case that the goods were returned damaged or missing, the evidence must rule out the possibility that the goods were not pilfered while in plaintiff's custody," and "because there exists a period of time during which [plaintiff's broker] is unable to account for the welfare of the container, plaintiff did not eliminate the possibility that the goods were not lost or stolen while in its custody;" and, adding that, although "there are several ways goods can be stolen from a sealed

container[ ] without disturbing the seals," "mere theoretical possibilities" that the goods were stolen while the sealed container was in the carrier's custody "may not be substituted for evidence" where there is no evidence to suggest that the security seals had been tampered with).

Thus, based on the totality of the circumstances present in this case – including the presence of the security seals, the absence of any evidence to suggest that there was a shortage of goods at the point of outturn, and the absence of any evidence to suggest that the loss was not equally likely to have occurred after outturn – the undersigned concludes that Channa has failed to prove that the loss occurred while the container was in Hybur's control because it did not satisfy the second prong of its *prima facie* case by demonstrating that the shortage existed at outturn.

The undersigned notes one additional point that was implicit in *Bally*, and which is made explicit here: COGSA's burden-shifting scheme presents the plaintiff and defendant with a parallel choice to either (1) confirm the weight of a sealed container upon taking custody of it, or (2) face a more difficult challenge of prevailing at trial in the event of a loss.

Thus, when it first receives custody of a sealed container, a carrier – like Hybur in this case – is faced with a decision if it intends to include the weight of the cargo in its Bill of Lading: On one hand, it may choose to incur the extra cost associated with weighing a sealed container to confirm the weight of the container that is provided by the shipper and to modify the Bill of Lading as necessary.  But, as Hybur discovered in this case, if it chooses not to incur those extra costs at the outset, it will generally be bound to the shipper's weight, which in most cases will suffice to satisfy the first prong of the shipper's *prima facie* case in the event of a loss.

26

Similarly, at the point of discharge, a shipper like Channa in this case – through its affiliate, Lapis, which acted as the consignee – is faced with a similar decision when it takes custody of the sealed container from the carrier.  Although it is not obligated to incur the cost of weighing the container at the time that it is delivered, in the event that there is a shortage, it will generally find it more difficult to prove that the loss occurred when the container was delivered and, therefore, find it more difficult to satisfy the second prong of its *prima facie* case.  *Cf. Bally*, 22 F.3d at 70-71 (noting that the carrier does not have the obligation of weighing the cargo at the time of delivery; adding that, "[i]f a sealed container is weighed both when it is delivered to the carrier and at the port of destination, unquestionably it would be easier to pinpoint where any cargo was lost from the container; and, concluding that, "[h]ad [plaintiff] weighed the container while it still was sealed, and thereby demonstrated a shortfall in weight at outturn, [it] would have had a better case[, but h]aving failed to do, and also having failed to prove by other evidence that the cargo was lost while it was in [defendant's] custody, [plaintiff] has not met its burden in this case.").

These burdens thus encapsulate the Court's ultimate conclusion that, although the first prong of Channa's *prima facie* case was established based on Hybur's failure to precisely weigh the cargo and rebut the weight listed on the Bill of Lading indicating that it received a full delivery of carpets at Port Everglades, Florida, Channa failed to establish the second prong of its *prima facie* case based on its own failure to weigh the container at the point of discharge at Puerto Morelos, Mexico, or to introduce any competent evidence to fulfill its burden of proving that there was a shortage of carpets at outturn, which was necessary to show that the loss occurred while the container was in Hybur's custody, rather than after Hybur relinquished custody of the container to the

27

consignee, Lapis.  It is, accordingly,

**ORDERED AND ADJUDGED** that Judgment is entered in favor of Defendant

Hybur, Ltd.

**DONE AND ORDERED** in chambers in Miami, Florida on May 11, 2009.

_Andrea M. Simonton_
_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

**Copies furnished to:**
**All counsel of record, via CM/ECF**